Plaintiff sues to recover workmen's compensation. He alleges that on July 22, 1939, while performing the duties of his employment with defendant he suffered an accident which produced permanent total disability to do work of any reasonable character. Specifically, he alleges that while tying a bundle of paper in defendant's finishing room, a "buggy" heavily loaded with paper was forcibly pushed against his body, striking the lower region of the back and "seriously and permanently injuring and impairing the muscles, ligaments, vertebrae and sacro-iliac area and joints, and in his right leg", resulting in the degree of disability alleged.
Defendant admits that on the day alleged, plaintiff was working for it, but expressly denies that he suffered any accident then or at any other time while in its employ; that he reported no accident to it that day and continued to work as usual through July 25th; that he did not report for work on July 26th and then advised defendant that he had experienced on July 22nd the accident alleged upon; that in keeping with its policy of liberality toward its employees, plaintiff's statement about the accident and consequent disability was accepted as true and compensation paid him to November 8th.
Defendant further avers that plaintiff engaged Dr. Howard E. Sims to administer medical aid to himself, and that this physician thereafter advised defendant that plaintiff had improved materially and was able to do light work, which plaintiff declined; that subsequent to this advice, plaintiff was requested by defendant to report to physicians of its choice for examination, but refused to do so until compensation payments were discontinued, and then submitted; that examinations revealed that if plaintiff was suffering from a back ailment and/or disability as claimed by him, such were not attributable to trauma but to enlarged prostate glands directly caused from active gonorrhea contracted about the fifteenth day of September, and to the gonorrhea itself.
Plaintiff's demand was rejected and he appealed.
Plaintiff testified that he was assisting a co-worker, F.H. Carraway, in tying a bundle of paper when hurt; that he was slightly bent over, pulling the bundle of paper toward the edge of the table on which located, when a loaded "buggy" pulled into and struck him in the small of the back. This "buggy" is described as a four wheel vehicle with a short tongue. It is pulled or pushed about by man power, generally from two to six, dependent upon the load.
When asked what effect the impact of the "buggy" had upon him, plaintiff answered: "It kind of made me dizzy and blind and everything seemed to be dark, wanted to whirl around. I stood there a minute and went on to work in about thirty minutes or an hour and commenced to get sick at my stomach and didn't know what was wrong with me."
He says that he then reported the accident to his foreman and went home. The foreman denied this, but it is admitted that plaintiff did quit work and leave the building at the time he claims. *Page 63 
Carraway testified that the "buggy" bumped against plaintiff and that it carried a load of 1,000 pounds. He gave the following testimony about the accident:
"Q. Did you notice anything wrong with him soon after that? A. No, sir, I never paid any attention to it except he said he was sick. I told him if he was sick he had better take off and go home."
He further testified that the incident made no impression upon him, and that after the lapse of some thirty minutes plaintiff complained of being sick and left the scene; also, that after being bumped into, plaintiff continued to assist him in tying paper. He did not think plaintiff reported for work thereafter.
There is no intimation from either plaintiff or Carraway that the "bump" from the loaded "buggy" knocked plaintiff down or unbalanced him to any extent.
Plaintiff also testified that he arose the morning of July 26th with the intention to resume work, but "passed out" on the way to the bath room, and vomited. He offers no corroboration on this score, but did summon Dr. Sims, a general practitioner, to prescribe for him. This physician made X-ray picture of plaintiff's lower back on July 27th and treated him thereafter. He was in bed two or three weeks. The picture, according to Dr. Sims, revealed a separation of the sacrum from the ilium, right side. A second picture was made on September 26th, which disclosed that the separation was less than previously. This indicated improvement. The patient was advised to wear a belt designed to bring these bones together. He did so and was using it at date of trial. Dr. Sims said that a strain caused the malposition of the bones. It was his opinion that the effects of the strain "with other physical symptoms" produced total disability to work. He did not specifically name the "other physical symptoms". We assume that he referred to the gonorrheal infection and enlarged glands. He discussed the case with defendant's officials and advised that plaintiff be given light work, but he declined to accede, assigning physical disability as the reason for so doing. It is not shown whether this suggestion was made before or after the second picture was made. At that time Dr. Sims discovered that he was suffering from active gonorrhea. We are inclined to think the suggestion was made prior to taking second pictures.
Dr. J.R. Anderson, an experienced roentgenologist, made a picture of plaintiff's lumbar and sacro spine on December 14, 1939. It revealed a rotary curvature to the left of the lumbar spine, the maximum being about the third lumbar vertebra. This, a malformation, he says, is not due to trauma. It renders this part of the spine more susceptible to injury than if normal because the center of gravity is not within the center of the vertebral bodies. Dr. Anderson found no separation of the sacrum from the ilium nor any fracture or other injury to the portion of the back X-rayed by him. He testified, however, that it is possible to produce total disability by straining the tissues and ligaments about this joint which condition the X-ray would not reveal. He was introduced as a witness by plaintiff.
Drs. W.C. Gray, J.B. Benton and W.V. Garnier physically examined plaintiff at defendant's request. Dr. Gray made a picture of his lower back on October 30th. Dr. Benton made several pictures of the same region. All of these doctors are firm in the opinion that there is no dislocation of the sacrum and ilium as found by Dr. Sims and all attribute plaintiff's disability to malignant gonorrheal infection and enlarged prostate glands. These doctors found the curvature of the spine testified about by Dr. Anderson and all agreed that it was not of traumatic origin because there is no evidence of a fracture which would have been present had the malformation been of that origin. They say that such a condition generally results from one leg being shorter than the other. It is produced by other causes, however.
Dr. Benton has had twenty-nine years of active experience as a physician and surgeon. Interpretation of X-ray pictures has engaged his attention for some fifteen years as an incident of his practice. When asked if plaintiff had been injured to the extent contended, could he have worked as usual for three days thereafter, he replied: "He would not have; he would have become immediately disabled, perhaps paralysed in both legs."
He also testified that "affected prostate glands give us the backache, lumbago, neuralgia, — the lumbar muscles in particular". He was asked if present disability had any causal connection with the injury of July 22nd, to which he replied: "No, I don't. I think if this prostate gland is cleared up and your gonorrhea is eradicated that he *Page 64 
will never know that he has ever had any trouble whatever with his back; that is my honest opinion about the case."
He further testified: "After we had the large picture I wasn't satisfied. I felt like if the boy did have a fracture or dislocation I wanted to know it. I didn't want to be a party to injustice, so we made those smaller pictures which bring out this. This is a lateral view; looking at it from the side we found no fracture, no dislocation, no softening, no evidence of any pathology, even though the slight curvature to the left, showing every socket in place. I have no idea there is no sacro-iliac involvement in the case; it didn't reveal any sacro-iliac; my picture was devoted to this curvature to determine whether he had or had not a fracture or a dislocation."
Dr. Benton made a physical test, the result of which he believes is conclusive of the correctness of his opinion that there is no displacement of the sacrum and ilium. The test was performed by straightening out the leg. Plaintiff made no outcry nor evinced shock from this test. Dr. Benton says that if this joint had been injured by dislocation of the bones or tearing of tissues or ligaments, the man could not have withstood the test as he did.
The fact that plaintiff complains of pains over a large part of his lower back and down through his right leg, argues rather strongly in favor of defendant's experts' opinion that the gonorrhea and its immediate effects are causing the pain and present disability. They say that if the joint was injured and separation of the bones resulted, the pain and discomfort would be confined to the area immediately about the locus, and not spread out.
It is not definitely shown what part of the load of paper came in contact with plaintiff's back. The paper was piled four feet high on the "buggy" but the height of the vehicle itself is not shown. However, Carraway says the paper "bumped" into plaintiff. It must have sideswiped him as it passed by. Had it struck him endwise he would have been injured in the side. The impact evidently was not forceful.
We are convinced that plaintiff was injured to some extent at the time and place he contends. We do not quite understand how he could have continued to work for three successive days and then be forced to bed two or three weeks from the effects of the trauma. He had had gonorrhea prior to the present infection, but it is not shown whether he was afflicted with such when injured. He says not.
After convalescing under Dr. Sims' treatment, he was considered able to do light work. He declined to do so, but was able to make a trip into the State of Texas, where he says he contracted the gonorrhea. While over there, he admits attending parties. The character of the parties is not shown.
If plaintiff was able to perform light work when he went to Texas and now is totally disabled to work, it follows that the venereal disease acquired while in Texas has, at least, materially contributed to present disability. We do not think Dr. Benton was wrong when he said that disability would be removed as soon as plaintiff was relieved of the gonorrhea and its effects on the glands.
We do not think plaintiff has by a preponderance of the testimony proven that his present disability has causal connection with the injury received while working for defendant. On the contrary, defendant's theory appears sustained. The trial judge evidently took this view of the case. He knows the witnesses and saw and heard them while testifying. No manifest error appears, and for these reasons, we are constrained to and do hereby affirm the judgment appealed from, with costs.
DREW, J., dissents. *Page 65